UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SANDRA SPERRY )
110 QUEENS ROAD )
TORRINGTON, CT 06790 )
)
    Plaintiff, )
)
v. ) CIVIL ACTION NO.: _____
)
LIBERTY LIFE ASSURANCE )
COMPANY OF BOSTON )
175 BERKELEY STREET )
BOSTON, MA 02116 )
)
    Defendant. )
)
SERVE ON: )
)
    CORPORATION SERVICES CO.)
    1090 VERMONT AVE., N.W. )
    SUITE 430 )
    WASHINGTON, D.C. 20005 )
)
_____)_____

## COMPLAINT

**(ERISA; Breach of Fiduciary Duty; Claim For Disability Benefits; Declaratory Relief; Injunctive Relief)**

Plaintiff, **SANDRA SPERRY**, by and through undersigned counsel, hereby sues Defendant, **LIBERTY LIFE ASSURANCE COMPANY OF BOSTON** (hereinafter "Liberty"), and in support thereof alleges as follows:

    1.    Plaintiff, **SANDRA SPERRY**, at the time this cause of action accrued, was an adult resident of the District of Columbia, who, at the time she became totally disabled as hereafter set forth, was employed as a Vice President and Corporate Executive of Westat (hereinafter "Employer") at 1650 Research Boulevard in Rockville, Maryland. Subsequent to

1

notification that her benefits were to be terminated in two years, due to financial reasons, Plaintiff sold her residence in the District of Columbia and moved to the State of Maryland. After her administrative appeal was denied, Plaintiff sold her residence in Maryland and moved to Connecticut, again due to financial reasons.

2. Defendant **LIBERTY** is an insurance carrier, incorporated in and having its principal place of business at 175 Berkeley Street in Boston, Massachusetts, and is authorized to do business and is carrying out business in the District of Columbia and the State of Maryland. At all times relevant hereto, Defendant had issued a Group Long Term Disability Insurance Policy (the "Plan") to the Employer that provided benefits to Employer's employees, including the Plaintiff. Defendant is a "fiduciary" within the meaning of 29 U.S.C. §1002(21)(A) of the Employee Retirement Income Security Act of 1974, as amended, ("ERISA"), and as such is required to administer the Plan solely for the benefit of participants and in accordance with the provisions of the governing Plan documents. (29 U.S.C. §1104(a)(1)).

3. The Plan issued by the Defendant is an "employee benefit plan" as defined by 29 U.S.C. §1002(3) of ERISA.

4. The Plan issued by the Defendant is a fully insured employee benefit plan established pursuant to 29 U.S.C. §1102 of ERISA.

5. The Plaintiff brings this action under 29 U.S.C. § §1132(a)(1)(B) and (a)(3) to recover employee benefits due to her under the terms of the Plan and to enforce her rights to recover such benefits under ERISA.

6. This Court is vested with jurisdiction in this action pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 (Federal Question).

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) in that the Plaintiff at all relevant

times lived in the District of Columbia, the Plan was administered in the District of Columbia, and benefits were provided to the participants of the plan in the District of Columbia. Id. (stating that actions brought by a participant, or beneficiary, for relief due under a plan "may be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found.")

## FACTUAL BASIS FOR RELIEF

8. Plaintiff was a Vice President who began her employment with Employer on or about March 3, 1975.

9. Subsequent to the time Plaintiff began her employment with Employer, Plaintiff became eligible to participate in an employee benefit plans provided by her Employer that included Long Term Disability Benefits. The Plan was funded through a Group Insurance Policy issued by Defendant to the Employer.

10. On or about March 29, 1995, the date Plaintiff ceased working full-time due to her disability, Plaintiff was a participant in the Plan. At that time, Plaintiff sustained a "Sickness", as defined by the Plan, and began suffering from multiple physical symptoms which have prevented her from performing her employment and which have been diagnosed as Chronic Fatigue Syndrome (hereinafter "CFS") by Plaintiff's Internist, James, H. Brodsky, M.D., a board certified internist. Plaintiff's symptoms include lethargy, extreme fatigue, anxiety, cognitive dysfunction, and substantial interference with concentration and memory. Plaintiff also regularly experienced headaches, musculoskeletal pain and difficulty sleeping.

11. On or about March 29, 1995, Plaintiff was forced to stop working full-time as a result the above mentioned symptoms. Plaintiff filed a claim for Progressive Partial Disability Benefits with Liberty on May 25, 1995. On July 25, 1995, Defendant Liberty approved her claim

for Partial Disability Benefits due to her diagnosed condition of CFS, subject to her satisfying a 60 day elimination period.

12.     After meeting the 60-day Elimination Period provided under the Plan, Plaintiff began receiving Partial Disability Benefits retroactive from May 28, 1995.

13.     Prior to the time Plaintiff became totally disabled, Plaintiff's job as a Vice President required sitting for long periods of time, physical exertion and cognitive ability for the duration of her work day.  Plaintiff's corporate duties as Director of the Survey Processing Staff Department required her to manage a data entry unit of 11 people, hire and properly place 130-150 temporary staff members, track assignments, execute performance and salary reviews for 50 permanent staff members, train and counsel survey processing staff members, participate in corporate management committee meetings, represent the company at conferences and discussion groups as an expert on computer assisted interviews, and prepare and present papers on computer-assisted interviews.

14.     Plaintiff was required to perform at a certain level while performing her occupation, or risk termination from her employment.  Prior to her March 29, 1995 illness, Plaintiff was a high performer and high achiever, exceeding the rating levels necessary to maintain her employment and rose through the ranks from the position of secretary in 1975 to vice president until the time of her sickness.

15.     Plaintiff's symptoms have continued to the present time.  She continues to experience lethargy, extreme fatigue, anxiety, cognitive dysfunction, and substantial interference with concentration and memory.  Plaintiff was prescribed a variety of treatments, including physical therapy and prescription Ambien, Claritin, Diflucan, Guanfenesin, Phentermine, Prozac, Sythroid, Trazodone, and Willbutrin.

16.     Since 1993, Plaintiff has been under the care of:

4

    1)    Dr. Judith L. Bader for radiology oncology;

    2)    Dr. James H. Brodsky, for internal medicine;

    3)    Ruth Cohen, L.C.S.Q., B.C.D., for psychotherapy;

    4)    Dr. Martha T. Cole, for gynecology;

    5)    May Kesler, M.S., P.T. at the Center for Physical and Massage Therapy.

    6)    Dr. Kenneth Miller, for oncology; and

    7)    Dr. John M. Livingood, for psychopharmacology.

17.    Since her initial diagnosis of CFS by James H. Brodsky, M.D., Plaintiff's illness has been confirmed by:

    1)    Paul H. Levine, M.D., a renowned expert in the field of Chronic Fatigue;

    2)    David A. Shostak, Ph.D, a licensed clinical psychologist;

    3)    Mark Moyer, M.D., who conducted a review of Plaintiff on behalf of Defendant; and

    4)    Barbara Jones, Ph.D, who performed a neurological IME upon Plaintiff on behalf of Defendant.

18.    On or about May 24, 1996, Dr. John M. Livingood, at the direction of Defendant, evaluated Plaintiff's capacity to perform worked related activities on a Liberty Mutual form. Dr. Livingood noted Plaintiff is significantly restricted from "Daily Activities: Occupational/Social" and significantly restricted in the category of "Sustain Work Performance." Dr. Livingood indicated that "fatigue is the most restrictive factor." He further indicates that "[i]t is difficult to separate out how much of this is depression, post-casualty, the effect of various medications, etc." Dr. Livingood also stated that Plaintiff was "not happy being able to work only part time."

19.    Despite Defendant's initial determination that Plaintiff suffered from CFS, on or

about July 1, 1996, Defendant determined that Plaintiff's claim was due to a "mental illness" as opposed to a physical illness. Defendant informed Plaintiff of the 24 month Mental Illness Limitation under the terms of the Plan and indicated that benefits would terminate on May 28, 1997.

20. On or about April 21, 1997, Dr. John Brodsky examined Plaintiff and determined that Plaintiff was suffering from CFS. Dr. Brodsky completed a Liberty Mutual "Attending Physician Statement Form" and indicated that Plaintiff was restricted from "physical exertion and stress."

21. As a result, Defendant re-approved Plaintiff's Partial Disability Benefits based on Plaintiff's inability to perform the duties of her occupation as Vice President and Director in the Data Management Department of Westat due to a physical disability, CFS. According to the Plan, upon medical proof of continuing disability, Plaintiff's Partial Disability Benefits were set to expire after 60 months, beginning On July 25, 1995 and ending in July 2000, unless Plaintiff presented further medical proof evidencing Total Disability and Own Occupation Disability.

22. On or about October 21, 1999, Westat informed Plaintiff of a change to the definition of disability in its Long Term Disability Policy effective May 27, 2000. The change provides full-time active salaried officers, administrators, executives and managers a 60 Month Own Occupation Benefit. According to the policy, benefits will only be paid after the 60 months period if Plaintiff is unable "to perform with reasonable continuity each and every duty of [her] own or any other occupation for which [she] is most reasonably fitted by training, education, experience, age and physical and mental capacity."

23. On or about November 3, 1999, Defendant arranged for Plaintiff to attend an Independent Medical Examination (hereinafter "IME") with Barbara P. Jones, Ph.D., to determine her continued eligibility for benefits beyond 60 months.

24. Dr. Barbara Jones conducted a clinical interview and neuropsychological testing of the Plaintiff on November 22, 1999 and December 7, 1999. She also reviewed Plaintiff's prior medical reports and records. She issued a Report of Neuropsychological Evaluation on December 13, 1999 based upon her neuropsychological IME of the Plaintiff. In that report, Dr. Jones indicated that Plaintiff's psychological and neuropsychological evaluation revealed certain significant findings including "some mild difficulty on some tasks of attention and concentration"; a "borderline or equivocal" score on "a sensitive test of constructional functioning"; "a relatively low score on a measure of verbal fluency"; "a profile on the MMPI-2 suggestive of conversion disorder or somatization disorder, as well as a DSM-IV Axis II diagnosis of dependent personality;" "a family history of affective disorder"; and "symptoms of anxiety, depression, perceived cognitive dysfunction, and fatigue."

25. Based upon her neuropsychological IME of the Plaintiff, Dr. Jones provided the following opinions:

1) "These findings, including the MMPI-2 findings (Schmaling and Jones, 1996), are all consistent with the published literature on CFS. A recent review of the neuropsychology of CFS (Tiersky et al., 1997) found that neuropsychological impairments are relatively subtle and are found primarily in the area of complex information processing speed and/or efficiency. (While four studies have not found reduced verbal fluency in CFS, one study did find reduced verbal fluency [Joyce et al., 1996]). Tiersly et al. also considered the possibility that the neuropsychological impairments if CFS might be due to psychiatric illness, primarily depression, and concluded that the evidence does not support such a conclusion."

2) "I would not expect her to be able to resume full-time, in-office work. I also feel it would be wise for her to stop working as director of her department and to work instead at a reduced level of responsibility."

3) In response to the question, "Are there signs of symptom magnification or malingering" posed by Defendant Liberty, Dr. Jones reported that Ms. Sperry did not score below cut-off scores for the

7

    detection of malingering on this test. Interestingly, she did score at about a chance level on the 36 "hard" items on this test, a finding which suggests that her working memory is overtaxed under stressful conditions. Dr. Jones went on to opine that Plaintiff's test results were "consistent with the findings of a recent study which concluded that CFS patients may have reduced working memory capacity . . . ."

26. On December 31, 1999, as a direct and proximate result of the physical ailments described above, Plaintiff was forced to stop working part-time due to her disability and Plaintiff became "totally disabled" as defined by the Plan.

27. Since March 29, 1995, and continuing to date, as a direct and proximate result of the above described physical ailments, Plaintiff has been disabled, as defined by the Plan. At all times since December 31, 1999, Plaintiff has been unable to perform each of the material duties of her occupation that she regularly performed for her employer and has been entitled to total disability benefits pursuant to the Plan.

28. In evaluating Plaintiff's continued disability, Defendant own "Record of Conversation" log on January 7, 2000 indicated that Defendant sought an Independent Medical Evaluation ("IME") from a doctor that "[d]oesn't like to make a dx of CFS." Defendant's decision to shop for another doctor occurred approximately three weeks after its receipt of Dr. Jones' Report of Neuropsychological Evaluation.

29. On November 20, 2000, Dr. Jones responded to Defendant's questions concerning her neuropsychological evaluation of Plaintiff. Dr. Jones stated, "One cannot really assess the possible influence of pain and depression apart from CFS on Ms. Sperry's cognitive functioning. All three diagnoses are known to be accompanied by cognitive impairment."

30. Defendant retained an investigator to conduct surveillance upon the Plaintiff. However, such surveillance by Defendant revealed minimal activity by Plaintiff.

31. On or about December 4, 2002, Plaintiff received a fully favorable decision on

her June 18, 2001 application for Disability Insurance Benefits from the Social Security Administration, finding her totally disabled.

32. All physicians that interviewed and medically examined Plaintiff indicated that Plaintiff was experiencing debilitating fatigue and suffering primarily from a physical illness.

33. Paul H. Levine, M.D., observed and reported on November 26, 2003 that Plaintiff was suffering from CFS, having more than four necessary criteria for the syndrome without other explanation for her symptoms. Dr. Levine found that:

1) Plaintiff's "cognitive disorder is classical and . . . Liberty Mutual's first neuropsychiatric evaluation performed by Dr. Barbara Jones . . . confirmed the diagnosis for CFS . . . ."

2) "The other supportive symptoms include the sleep disorder, the fibromyalgia-like pain, and the fatigue after exertion, which included extensive conversation."

3) Dr. Levine indicates that "elevated antibody titers for Epstein-Barr virus which is not part of a major depression or bipolar disorder . . . is frequently found in CFS as a reflection of disordered immune function in patients with CFS."

4) Addressing the notion that Plaintiff suffers from major depression, Dr. Levine notes that, "it is important to add that [Plaintiff] is really struggling to improve her health, she has been active with several competent health care workers, and in some areas, shows definite signs of improvement. Id. This is not the pattern of someone with major depression or any other possible alternative."

5) Dr. Levine finds that Plaintiff "is a highly motivated woman who is handicapped by her illness . . . ."

6) Finally, Dr. Levine concludes that Plaintiff "has CFS and does not have any evidence of exclusionary criteria, such as bipolar disorder or depression. She has the classic neurocognitive disorder, sleep disturbance, fibromyalgia-like pain and fatigue after exertion, which could even be extensive conversation as well as test-taking as documented by Dr. Shostak. As a result, it is my opinion that [Plaintiff] is unable to perform the duties of any occupation, including her former occupation . . ., and is therefore disabled from any gainful employment due to her physical condition."

34. David A. Shostak, Ph.D., observed Plaintiff over a 2 day period and reported that:

   1) She appeared "puffy in the face and noticeably fatigued midway through the exam. She was subjectively insensitive to the outward manifestation of her fatigue. She was more aware of her grossly depleted arousal level later into the exam."

   2) "Further into the testing, she became more bombarded by the intrusion of extraneous stimuli, having successfully filtered it from her directed attention, earlier on."

   3) In reviewing Plaintiff's results from a 1999 test performed upon her by Dr. Barbara Jones upon Defendant's request, the 2002 neuropsychological testing also requested by Defendant, and Dr. Shostak's testing, Dr. Shostak observed that "her's is a [sic] example of where, on the surface, the individual component mechanisms underlying cognition do not appear patently dysfunctional, but there 'the engine doesn't run.'"

   4) He states that "there is a fundamental deficit impairing her neurocognition . . . [which] disables the tasks of her daily adaptation."

   5) "She is an extremely exacting, bright and insightful woman. Across three different exam protocols, the degree of performance consistency is remarkable."

   6) In conclusion, Dr. Shostak finds that Plaintiff's "substantially diminished cognitive functioning renders her incapable of performing full-time work in any field.

35. James H. Brodsky, M.D., observed Plaintiff over eight years, and in a report dated January 17, 2003, stated that Plaintiff "has had Chronic Fatigue Syndrome for eight years. She worked part-time for the first five years of her illness, but found that each year she was able to work fewer days outside of the home that she worked the year before." He further notes that:

   1) Plaintiff "experiences significant physical fatigue on a daily basis. Her abilities for focus and concentrate are limited by fatigue and do not allow her to work for eight hours a day. Her most stringent restriction, however, is the fact that she is frequently unable to leave her apartment for days in a row

because of the amount of effort required to go out on one day results in post-exertional malaise the following day."

2) "Treatment with psychotropic medications relieved her symptoms of depression and anxiety; treatments that I prescribed eliminated the recurrent sinus infections that she was experiencing; treatment with physical therapy controlled her symptoms of fibromyalgia, but Ms. Sperry's fatigue continually increased."

3) "By the end of the fifth year, 1999, she was so exhausted that she could not continue to work even those hours. Her Chronic Fatigue Syndrome, with its associated cognitive impairments, is the primary reason for her inability to work."

36. Mark Moyer, M.D., Defendant's medical review physician, acknowledged the diagnosis of CFS and did not refute CFS as Plaintiff's primary diagnosis in his December 31, 2002.

37. Despite the overwhelming evidence of record from both physicians who have treated Plaintiff and physicians who have reviewed Plaintiff's medical records and/or conducted an IME of the Plaintiff, Defendant determined that Plaintiff was suffering from a Mental Illness. As a result, Defendant only approved Plaintiff for an additional 24 months of disability finds, commencing January 2, 2003 and ending December 31, 2004.

38. Plaintiff's treating and examining physicians continue to demonstrate that Plaintiff is suffering from a physical, as opposed to mental illness. However, Plaintiff has not received any long term disability benefits from the Defendant for the period January 1, 2005 to the present.

39. The Plan provides that the Defendant will pay a monthly benefit when it receives proof that an insured is disabled due to sickness or injury.

40. Defendant has received proof that Plaintiff is disabled due to sickness or injury.

41. Defendant has refused to pay disability benefits pursuant to the terms of the Plan.

11

42. Plaintiff has met any and all conditions precedent to entitlement to Long Term Disability Benefits pursuant to the terms of the Plan and to obtaining an award of Long Term Disability Benefits.

## TERMS OF THE PLAN

43. The Plan defines "Physician" as follows:

**PHYSICIAN** means a person who:

    (1) is licensed to practice medicine and prescribe and administer drugs or to perform surgery; or

    (2) is legally qualified as a medical practitioner operating within the scope of his license; and

    (3) is not an employee or his spouse, daughter, son, father, mother, sister or brother.

44. The Plan provides different definitions of "Total Disability" or "Totally Disabled" for different classes of employees. The applicable disability standard for Plaintiff's status as a Vice President and Corporate Executive is:

If you are a full-time active salaried officer, administrator, executive, manager, contract or other professional employee whose annual salary is $30,000 or more, you are eligible for a 60 Month Own Occupation Benefit. (See A below under Total Disability or Totally Disabled.)

**TOTAL DISABILITY** or **TOTALLY DISABLED** means:

    (A) During the elimination period and the next 60 months of disability you are:

        (1) unable to perform each and every duty of your occupation on a full-time or part-time basis because of a disability:

            (a) caused by injury or sickness;

            (b) that started while you are covered; and

12

      (2)    after 60 months of benefits have been paid, you are unable to perform with reasonable continuity each and every duty of your own or any other occupation for which you are or become reasonably fitted by training, education, experience, age and physical and mental capacity.

45. At all times since 1995, Plaintiff has had a "Disability" under the terms of the Plan.

46. The Plan defines "'Sickness" to mean "illness, disease, pregnancy or complications of pregnancy."

47. Plaintiff has a Sickness under the Plan.

48. Plaintiff was an employee in an eligible class prior to the effective date of the Plan.

### PLAINTIFF'S ADMINISTRATIVE CLAIM AND APPEALS

49. On or about March 21, 2003, Defendant limited Plaintiff's Long-Term Disability benefits under the Mental Illness Limitation of the Plan to a maximum period of 24 months commencing from January 2, 2003, ending on December 31, 2004.

50. Defendant paid benefits to Plaintiff through December 31, 2004 at which time it terminated her benefits. The termination of Plaintiff's benefits was without factual basis and contrary to the express terms of the Plan.

51. On or about April 15, 2005, Plaintiff appealed the wrongful termination of her Long Term Disability Benefits.

52. On or about July 28, 2005, Defendant wrongfully denied Plaintiff's appeal for Long Term disability Benefits.

53. Defendant has wrongfully refused to pay and has not paid any benefits since December 31, 2004 to the Plaintiff as a result of her total disability.

54. Plaintiff has filed this suit within two (2) months of the date of that denial.

13

## COUNT I
### (Wrongful Denial Of Benefits)

55. Plaintiff incorporates by reference paragraphs 1 through 54 of the Complaint as if fully stated herein.

56. Defendant has failed to properly interpret and administer the provisions of the Plan as required by ERISA § 404, 29 U.S.C. § 1104.

57. Defendant has denied Plaintiff benefits to which she is entitled under the Plan and has failed to properly consider the evidence submitted by Plaintiff in support of her claim for benefits.

58. Plaintiff is entitled to long-term disability benefits under the terms of the Plan.

59. Defendant has failed to pay to Plaintiff the disability benefits to which she is entitled and has denied Plaintiff disability benefits to which she is entitled under the Plan.

60. At all time relevant herein, Defendant has acted under a conflict of interest and has placed its pecuniary interests before the interests of the Plaintiff in wrongfully terminating Plaintiff's Long-term Disability Benefits in clear violation of the terms of the Plan.

61. The above acts and/or omissions by Defendant constitute a breach of its fiduciary duty to properly administer the Plans solely for the benefit of the Participants and in accordance with the provisions of the governing plan documents as required by ERISA § 404, 29 U.S.C. § 1104.

62. The Plan does not vest discretionary authority in the Defendant to make eligibility determinations or to construe the terms of the Plan.

63. The Defendant's wrongful acts and/or omissions are subject to a *de novo* review by the Court.

64. As a direct and proximate result of Defendant's breach of its fiduciary duties owed to the Plaintiff pursuant to the provisions of the Plan and as imposed by ERISA, the Plaintiff has been denied long-term disability benefits to which she is entitled under the Plan and has been caused to sustain economic hardship and damages on a continuing basis.

65. Plaintiff is entitled to recover her benefits under the Plan and to an Order enforcing the terms of the Plan pursuant to ERISA § 502, 29 U.S.C. § 1132(a)(1)(B) and (a)(3).

**WHEREFORE,** Plaintiff, **SANDRA SPERRY**, demands judgment from and against the Defendant, **LIBERTY LIFE ASSURANCE COMPANY OF BOSTON**, and requests the Court to:

(a) Issue an injunction prohibiting Defendant from future breaches of their fiduciary duties under the terms of the Plan;

(b) Declare that Plaintiff is entitled to long-term disability benefits provided to her under the Plan and continuing until such time as she is no longer disabled under the terms of the Plan;

(c) Order the Defendant to make a full accounting of all long-term disability benefits due to Plaintiff under the Plan, both past and future;

(d) Order the Defendant to pay all past benefits due to Plaintiff under the Plan;

(e) Order the Defendant to pay all future benefits due to Plaintiff under the Plan as such benefits become due and payable;

(f) Order the Defendant to pay pre-judgment interest on all benefits that are presently due and owing to the Plaintiff at the legal prevailing rate;

(g) Award post-judgment interest at the legal prevailing rate;

    (h)    Award the Plaintiff attorney's fees and costs incurred in bringing this action, to be paid by the Defendant, pursuant to 29 U.S.C. §1132(g)(1); and

    (i)    Award such further relief as this Court may deem just and proper.

Respectfully submitted,

**McCHESNEY & DALE, P.C.**

By: _____
Charles F. Fuller
D.C. Bar No. 406085
4000 Mitchellville Road
Suite 222B
Bowie, Maryland 20716
Phone Number (301) 805-6080
Fax Number (301) 805-6086
Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Complaint was mailed, first class, postage prepaid, this 30th day of November 2007, to:

> The Honorable Elaine Chao
> Secretary of Labor
> U.S. Department of Labor
> 200 Constitution Avenue, N.W.
> Washington, D.C. 20210
>
> The Honorable Henry Paulson
> Secretary of the Treasury
> 15th and Pennsylvania Avenue, N.W.
> Washington, D.C. 20220

_____
CHARLES F. FULLER

\\Mds\client_fil\Sperry, Sandra\Pleadings\Complaint Draft 3 - SPERRY.doc

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Sandra Sperry<br>110 Queens Road<br>Torrington, CT 06790 | Liberty Life Assurance Company of Boston<br>175 Berkeley Street<br>Boston, MA 02116 |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  88888<br>(EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  88888<br>(IN U.S. PLAINTIFF CASES ONLY)<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Charles F. Fuller<br>McChesney & Dale, P.C.<br>4000 Mitchellville Road, Suite 222<br>Bowie, MD 20716<br>(301) 805-6080 | |

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
⦿ 3 Federal Question (U.S. Government Not a Party)
○ 2 U.S. Government Defendant
○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)**   OR   ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ G. *Habeas Corpus/ 2255* | ○ H. *Employment Discrimination* | ○ I. *FOIA/PRIVACY ACT* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights (non-employment)* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☒ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**
- ⦿ 1 Original Proceeding
- ○ 2 Removed from State Court
- ○ 3 Remanded from Appellate Court
- ○ 4 Reinstated or Reopened
- ○ 5 Transferred from another district (specify)
- ○ 6 Multi district Litigation
- ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
Suit for recovery of long term disability benefits pursuant to 29 U.S.C. 1132

**VII. REQUESTED IN COMPLAINT**    CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 ☐    DEMAND $ _____    Check YES only if demanded in complaint
JURY DEMAND:    YES ☐    NO ☒

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐    NO ☒    If yes, please complete related case form.

DATE 11/30/2007    SIGNATURE OF ATTORNEY OF RECORD  *[signature]*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed <u>only</u> if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the <u>primary</u> cause of action found in your complaint. You may select only <u>one</u> category. You <u>must</u> also select <u>one</u> corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.